IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

RONALD DICK,

                    Plaintiff,

     vs.

CITY & BOROUGH of SITKA & THE
SITKA POLICE DEPARTMENT,

              Defendants.

Case No. 3-23-CV-00041-HRH

**ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT**


       Plaintiff Ronald Dick ("Plaintiff") moves for partial summary judgment against defendants City and Borough of Sitka ("Sitka") and the Sitka Police Department ("SPD"; collectively "Defendants").[1] This motion is opposed by Defendants.[2] They also cross-move for full summary judgment.[3] The cross-motion is opposed.[4] Oral argument was requested by Plaintiff.[5] Oral argument is not deemed necessary.

---

[1] Docket No. 9

[2] Docket No. 13.

[3] Id.

[4] Docket No. 21.

[5] Docket No. 22.

## FACTS

This case stems from Plaintiff's use of a modified, electric-powered golf cart on the roads in Sitka, Alaska. He asserts the golf cart is necessary to accommodate physical disabilities stemming from his years of military service.[6] These disabilities include spinal stenosis, osteoarthritis, and problems with his rotator cuff.[7] They cause severe mobility impairments that affect his ability to walk even short distances, his balance and coordination, his fine motor skills, and his range of motion with his upper extremities.[8] These impairments prevent him from driving, entering, or sitting in a car; sitting straddled on a bicycle, motorcycle, or ATV; and steering anything that requires him to have his arms above his shoulders.[9]

Plaintiff mitigates the effects of these mobility impairments by driving the golf cart instead of a car around Sitka. He can independently get into and out of the golf cart.[10] He can manipulate its controls without difficulty.[11] He can travel further distances using the golf cart than he can by walking and generally uses it to travel a couple blocks up to "a few miles."[12] His ability to use the golf cart has allowed him to

---

[6] Docket No. 11 at ¶¶ 2, 8, 25.

[7] Id. at ¶¶ 4, 5.

[8] Id. at ¶¶ 8-16; Docket Nos. 11-2, 11-3.

[9] Docket No. 11 at ¶¶ 17-21.

[10] Docket No. 11 at ¶ 26.

[11] Id. at ¶ 27.

[12] Id. at ¶¶ 28, 44.

attend his various medical appointments.[13]  The benefits to Plaintiff are such that his doctor has prescribed its use as a mobility device.[14]

When Plaintiff began driving the golf cart around Sitka in early 2019, he encountered some initial inquiries and concerns from local law enforcement. Ultimately, after consultation with the Alaska Department of Public Safety, SPD concluded that any electric vehicle equipped with lights and a horn could operate on roadways designated for speeds not to exceed 35 miles per hour.[15]  In compliance with these standards, Plaintiff drove the golf cart without interference from SPD for over three years.[16]

SPD's accommodation of Plaintiff's golf cart suddenly stopped on May 27, 2022. On that morning, Plaintiff drove the golf cart to an appointment at a local hospital. Upon leaving his appointment, Plaintiff saw an SPD patrol car parked near his golf cart. When he entered the cart and released the brake, the patrol car's lights and siren initiated.[17]  Officer Mark Chandler exited the patrol car and approached Plaintiff to investigate the golf cart.  After telling Plaintiff to "sit tight" and receiving back up from other SPD officers, he informed Plaintiff that he was no longer allowed to drive the golf cart on the roads or sidewalks and would have to leave the golf cart on hospital grounds

---

[13] Id. at ¶¶ 30-31, 44.

[14] Docket No. 11-1.

[15] Docket No. 11-5.

[16] Docket No. 11 at ¶ 43.

[17] Docket No. 11 at ¶¶ 48-50.

and find an alternate way home.[18]

Plaintiff's subsequent efforts to reverse SPD's decision about the golf cart failed. The SPD would not consider his complaint.[19] Sitka's city attorney, Brian Hanson, told Plaintiff that Sitka's code no longer allowed him to drive his golf cart on the roads and that the city did not have to forgo enforcement of its code as an accommodation under the Americans with Disabilities Act ("ADA").[20] Plaintiff disagreed, arguing the ADA requires a public entity to accommodate non-wheelchair mobility devices—referred to under the ADA regulations as "other power-driven mobility devices" or "OPDMDs"— in all areas where the public is allowed to go, including roads, absent some set of limiting safety requirements that are specifically adopted and implemented to balance access and safety.[21] He relied upon an ADA publication issued by the Department of Justice ("DOJ"), which addresses the regulation it implemented with regard to OPDMDs ("OPDMD regulation"). Rejecting Plaintiff's proposition, Mr. Hanson asserted that the OPDMD regulation only applies to places open to public pedestrian use, not roadways and highways.[22] The disagreement about the applicability of the ADA and the OPDMD regulation created an impasse. The parties did not try to agree upon a limited accommodation or otherwise confer further on the issue. Instead,

---

[18] Id. at ¶¶ 52-56.

[19] Id. at ¶ 58.

[20] Docket No. 11-7.

[21] Docket Nos. 11-6, 11-7.

[22] Docket No. 11-6.

4

Plaintiff filed this lawsuit.

Plaintiff's complaint asserts that Defendants violated the ADA by denying him use of his golf cart on its roadways.[23] He argues that the Defendants have failed to assess the use of OPDMDs by those with mobility impairments as is required under the ADA regulations, and thus has failed to adequately demonstrate that his golf cart cannot be safely accommodated.[24] His complaint also raises a claim for unlawful arrest and intentional infliction of emotional distress under state law based upon his encounter with the SPD officers on May 27, 2022.[25]

STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

---

[23] His complaint and brief mention that the ADA claim encompasses the use of his golf cart on both roadways and sidewalks. However, the facts as alleged and as presented in this motion for summary judgment do not show that Plaintiff ever drove the golf cart on the sidewalks or sought permission to use the cart on the sidewalks after he was prohibited from driving it on the roadways. The dispute between the parties relates to Plaintiff's use of his golf cart on Sitka's roadways.

[24] Docket No. 1 at ¶¶ 14, 17-19.

[25] Id. at ¶¶ 20-26.

In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." Arandell Corp. v. Centerpoint Energy Servs., Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." Tulalip Tribes of Wash. v. Washington, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two, 249 F.3d 1132, 1134 (9th Cir. 2001)). "Each motion must be considered on its own merits." Fair Hous. Council of Riverside Cty., Inc., 249 F.3d at 1136.

DISCUSSION

ADA Claim

Plaintiff raises a claim under Title II of the ADA, which prohibits disability discrimination with regard to services, programs, and activities offered by public entities. Title II states as follows:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a

public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Based on this provision, a public entity must operate its services,

programs, and activities in a manner that provides meaningful access to individuals with

disabilities.  Hunsaker v. Contra Costa Cty., 149 F.3d 1041, 1043 (9th Cir. 1998).  This

accessibility standard requires a public entity to make reasonable modifications to

policies and practices when necessary to accommodate individuals with disabilities

unless those modifications would fundamentally alter the nature of the service, program,

or activity.  28 C.F.R. § 35.130(b)(7).

    The Ninth Circuit has explained the plaintiff's burden of proof under Title II.

Weinreich v. L.A. Cty. Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).  First,

the plaintiff must show he is a "qualified individual with a disability."  Id.  This means

that the plaintiff must be able to meet, with or without reasonable accommodation, the

"essential eligibility" requirements for the benefit offered.  42 U.S.C. § 12131(2).

Second, the plaintiff must show that he was excluded from participation in or denied the

benefits of a public entity's services, programs, or activities.  Weinreich, 114 F.3d at

978.  Third, he must demonstrate that the exclusion or denial was because of his

disability.  Id.  Exclusion or denial on the basis of disability includes situations where a

public service, program, or activity is not accessible to and useable by an individual

because of his or her disability.  In a failure to accommodate claim, the plaintiff has the

burden to show the existence of a reasonable accommodation not provided by the public

entity that would make the service at issue readily accessible to him and to show that

any accommodation offered by the public entity did not reasonably facilitate access.

See Memmer v. Marin Cty. Courts, 169 F.3d 630, 633-34 (9th Cir. 1999); Duvall v.

Cty. of Kitsap, 260 F.3d 1124, 1137 (9th Cir. 2001). If the plaintiff can show as much,

the burden switches to the public entity to demonstrate that the requested

accommodation would fundamentally alter the nature of the program. 28 C.F.R. §

35.130(b)(7); see Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1047 (9th Cir.

1999).

That Sitka is a public entity subject to Title II is without dispute. However, there

was an initial suggestion by Sitka's city attorney that roadways are not considered part of

the city's services, programs, or activities covered under the ADA.[26] Such an assertion is

wrong.

Title II broadly applies to "anything a public entity does." Barden v. City of

Sacramento, 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting Lee v. City of Los Angeles,

250 F.3d 668, 691 (9th Cir. 2001)). As briefed by Plaintiff in his supporting

memorandum, this includes enforcing local nuisance codes, licensing decisions, police

actions during arrests, enforcement of public health quarantines, zoning decisions, and

provisions for on-street parking.[27] These types of normal functions of government

necessarily encompass a city's provision of public roadways. The Ninth Circuit has

already held that public sidewalks are a service of government within the meaning of

Title II and therefore are subject to accessibility regulations promulgated by the

---

[26] He stated that "public roadways in Sitka are NOT places of public accommodation subject to the ADA." Docket No. 11-7.

[27] Docket No. 10 at 17.

8

Department of Justice. Barden, 292 F.3d at 1074. The same reasoning would apply to a government's provision of roadways for public use. See Young v. City of Claremore, 411 F. Supp. 2d 1295, 1304 (N.D. Okla. 2005) ("[T]he Court finds that use of the streets, roadways, and highways located in the City of Claremore for purposes of transportation constitutes a public service, program, or activity under the ADA."). Indeed, that the use of public roads is a government service within the meaning of Title II is now clearly conceded by Defendants, as they do not argue that the ADA is inapplicable.

Defendants' opposition is instead based on a reasonableness. They contend that allowing Plaintiff to continue to use his golf cart on its roadways is not a reasonable accommodation required under the ADA. To accommodate Plaintiff's continued use of his golf cart, Defendants would have to forego enforcement of its recently enacted ordinance that regulates "All-purpose Vehicles" ("APVs"). Sitka, AK, General Code § 11.75 (2023) (revised March 2022), https://www.codepublishing.com/AK/Sitka/ (last visited Dec. 22, 2023). [28] APVs include all self-propelled vehicles designed to travel on wheels or tracks in contact with the ground and commonly used to transport persons for recreational purposes. Id. at §11.75.010(A). This APV ordinance came on the heels of a new APV regulation promulgated by the Alaska Department of Public Safety. 13 AAC § 02.325(g) (effective Jan. 1, 2022). Under the state regulations, unless otherwise prohibited by local ordinance, APVs are allowed on roadways where the speed limit is less than 45 miles per hour if they are registered and insured, have license plates, and are

---

[28] A copy of Sitka's APV ordinance is at Docket No. 13-3.

9

equipped with basic safety equipment such as lights, reflectors, brakes, an emission control system, and a throttle. 13 AAC §§ 02.325(g), 02.482(c), 04.400–.420; AS §§ 28.10.011, 28.22.011. State law also permits the use of low-speed vehicles—vehicles that travel between 20 and 25 miles per hour—on roadways posted for a speed limit of 35 miles per hour or less, unless otherwise prohibited by local ordinance. AS §§ 28.35.261, 28.90.990. Again, these vehicles must be registered and insured, with certain limited exemptions, and comply with the equipment and safety requirements set by the Alaska Department of Public Safety. AS §§ 28.90.990, 28.10.011, 28.22.011.

As is allowed under the applicable state regulation, Sitka passed its APV ordinance to further limit the use of these alternate vehicles. To operate an APV on Sitka's roadways the owner must obtain a permit from the SPD. Sitka, AK, General Code § 11.75.030(A). To receive a permit, that person must show that the APV has the necessary registration and insurance coverage. Sitka, AK, General Code §§ 11.75.030(D), 11.75.040(B), (C). The APV must also pass a safety inspection to verify it is equipped not only with the basic safety features required by the state but also the more stringent features required under Sitka's ordinance, such as turn signals, fenders, and speedometers. Sitka, AK, General Code §§ 11.75.030(C); 11.75.040(D). The ordinance also requires a minimum level of engine power and mandates that any APV travel at the posted speed limit of the public roadway it drives upon. Sitka, AK, General Code § 11.75.040(F)(9), (10). This would presumably affect the ability of a low-speed APV to drive on certain roadways in Sitka.

Plaintiff did not apply for an APV permit under the new ordinance, nor did he ask

the SPD for a modification to the ordinance that would allow him to lawfully drive the golf cart in Sitka. Instead, the accommodation he requested was to be allowed to drive the golf cart as he had been doing, without regard to the local ordinance. SPD denied his request. It would not let Plaintiff continue to drive his golf cart unencumbered by any registration, insurance, or permitting requirements. Plaintiff contends this denial was unreasonable.

The unreasonableness of this denial, he asserts, has been predetermined under the OPDMD regulation, 28 C.F.R. § 35.137(b). This regulation establishes a presumption that allowing the use of an otherwise prohibited OPDMD by individuals with mobility disabilities is a reasonable accommodation.[29] This presumption of reasonableness can only be rebutted if the public entity makes an assessment, based on a list of five specific factors, that the OPDMD "cannot be operated in accordance with legitimate safety requirements." 28 C.F.R. § 35.137(b)(2). Sitka, according to Plaintiff, failed to make the required assessment and therefore cannot demonstrate any legitimate safety concern to overcome the presumption that his request to drive his golf cart as he had been doing for the prior three years was reasonable.

Plaintiff's reliance on 28 C.F.R. § 35.137(b) is misplaced. The OPDMD regulation is not applicable to situations where individuals with mobility disabilities seek to drive OPDMDs as vehicles on public roadways. This becomes evident when the

---

[29] 28 C.F.R. Pt. 35, App. A ("[P]ublic entities are by default required to permit the use of other power-driven mobility devices; the burden is on them to prove the existence of a valid exception.").

regulation is considered in its entirety. Section 35.137, as a whole, is meant to address all "Mobility devices." Subsection (a) addresses the "[u]se of wheelchairs and manually-powered mobility aids." It states as follows:

> A public entity shall permit individuals with mobility disabilities to use wheelchair and manually-powered mobility aids, such as walkers, crutches, cane, braces, or other similar devices designed for use by individuals with mobility disabilities, in any areas open to pedestrian use.

28 C.F.R. § 35.137(a). The next subsection, § 35.137(b), addresses the "[u]se of other power-driven mobility devices." Subsection (b)(1) states as follows:

> A public entity shall make reasonable modifications in its policies, practices, or procedures to permit the use of other power-driven mobility devices by individuals with mobility disabilities, unless the public entity can demonstrate that the class of other power-driven mobility devices cannot be operated in accordance with legitimate safety requirements that the public entity has adopted pursuant to § 35.130(h).

28 C.F.R. § 35.137(b)(1). While subsection (b) is not explicitly limited to areas of pedestrian use as is subsection (a), a careful reading of subsection (b)(2) demonstrates that pedestrian use areas are the intended scope of § 35.137. Subsection (b)(2) states that when determining under (b)(1) whether a particular type of OPDMD can be accommodated "in a specific facility" it must consider a variety of factors including "[t]he facility's volume of pedestrian traffic" and "[t]he facility's design and operational characteristics," which include whether the service, program, or activity offered in the facility is an indoor or outdoor one, the facility's square footage, the density of stationary things in the facility, and the availability of storage for the OPDMD. 28 C.F.R. § 137(b)(2)(ii)-(iii). It also requires the public entity to consider whether additional safety features could facilitate the use of an OPDMD "in the specific facility." 28 C.F.R. §

12

35.137(b)(2)(iv).  Altogether, this language suggests that the regulation in its entirety, including both subsection (a) and subsection (b), instructs public entities on how to address the use of OPDMDs in facilities where there is public pedestrian traffic.  It is not meant to govern whether OPDMDs should be allowed to operate as vehicles on public roadways.

An online publication from the DOJ also supports this conclusion.  U.S. Dep't of Justice, ADA Requirements: Wheelchairs, Mobility Aids, and Other Power-Driven Mobility Devices (Last Updated Feb. 28, 2020), https://www.ada.gov/resources/opdmds/. It explains that the DOJ's rules require public entities to allow people with disabilities using wheelchairs—manual or powered, as well as electric scooters—into all areas of a facility where the public can go.  It further explains that the rules require entities to allow people with disabilities who use an OPDMD "to enter the premises" unless there are legitimate safety requirements in place that prevent the entity from accommodating a specific type of OPDMD.  Id.

In the publication, examples of facilities discussed include hospitals, malls, stores, public parks, and offices.  Examples of legitimate safety requirements include "limiting speed to the pace of pedestrian traffic or prohibiting use on escalators."  Id.  The publication explains the required five-factor assessment and warns that, in most circumstances, it expects "devices such as Segways can be accommodated" and "ATVs and other combustion engine-driven deices may be prohibited indoors and in outdoor areas with heavy pedestrian traffic."  Id.  It explains that under the DOJ's rules, the entity should develop and publicize rules for people needing to use these devices.  Examples of

such rules provided in the publication are "requiring the user to operate the device at the speed of pedestrian traffic," "identifying circumstances (if any) where the devices cannot be accommodated," "setting out instructions for going through security screening," and "specifying whether or not storage is available for the device when it is not being used." Id. Again, this language suggests that the DOJ intended this regulation on mobility devices to cover public facilities where people enter and are admitted into and thus where the devices will be in proximity to other members of the public who are on foot.

Nothing suggests that the DOJ expected § 35.137 to cover a situation where a person with a mobility disability seeks to use an OPDMD as a vehicle upon a public roadway. If that were the case, a public entity would, by default, be required to allow a person with a mobility disability to use any OPDMD on its roadways. It could only prohibit such use if it undertook the ADA-specific task of assessing each class of OPDMD to determine whether it can be safely accommodated. It would be liable under the ADA if it failed to conduct the required five-factor assessment in § 35.137(b)(2) for the type of OPDMD at issue, even when the safety issues are readily apparent and the OPDMD would not pass muster under essential motor vehicle laws.

Inasmuch as the OPDMD regulation applies here, Plaintiff does not benefit from any presumption that his request to continue to use his golf cart on Sitka's roadways as he had been doing is reasonable. He must bear his initial burden of producing evidence to support his failure to accommodate claim. Therefore, before Sitka can be held liable under the ADA for prohibiting his use of the golf cart, he must present sufficient evidence to demonstrate that he can meet the "essential eligibility" requirements needed

14

to use the roadways and that there is a reasonable accommodation available that is necessary for him to have meaningful access to the roadways. Which provisions in Sitka's motor vehicle laws constitute "essential eligibility" requirements and which provisions can be reasonably modified are "two sides of a single coin" here. Cf. Alexander v. Choate, 469 U.S. 287, 299 n.19 (1985) (applying § 504 of the Rehabilitation Act, which the ADA was modeled after, and noting that "the question of who is 'otherwise qualified' and what actions constitute 'discrimination' under the section would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of [those with disabilities"). If a provision is an essential eligibility requirement for driving upon the roadways, it cannot be disregarded or substantially modified. The determinative issue is the extent to which Sikta is required to forego enforcement of its motor vehicle laws to make the roadways accessible to Plaintiff via the use of his golf cart. There is simply not enough evidence in the record at this juncture from which to conclude that this issue of fact is beyond dispute.

Sitka asserts that Plaintiff's request to drive his golf cart as he had been doing is no longer necessary given its new ordinance. It argues that the APV permitting process provides a reasonable accommodation for users of OMPDs like Plaintiff who want to use their OMPDs as vehicles on the roadway. That is to say, Sitka argues Plaintiff has not in fact been denied meaningful access; the access is simply more restrictive than previously allowed. It stresses that Plaintiff never initiated the permitting process and therefore never properly began the process of identifying the needed modifications. It is Plaintiff's

15

burden to show that this process does not in fact provide him reasonable access. <u>Duvall</u>, 260 F.3d at 1137.

Plaintiff has not put forth facts to adequately demonstrate that Sitka's insistence on treating his golf cart as an APV deprives him of meaningful access to its roadways. He does not present evidence that reflects upon his ability to get an APV permit. There is no information presented about which safety features the golf cart lacks and whether it could meet the necessary power and speed requirements. There is no information about Plaintiff's ability to get the golf cart registered and insured. Assuming, as the parties seem to do, that there are some requirements of the APV ordinance that Plaintiff's golf cart does not satisfy, there is no evidence detailing which ones are lacking and whether those can be deemed essential. If any such missing safety requirements can in fact be deemed essential, there is no evidence as to whether the golf cart can be modified to satisfy the requirements. Indeed, issues surrounding what traffic regulations are essential to roadway transportation and what constitutes a reasonable accommodation are fact-specific inquiries. <u>See</u> <u>Nunes v. Wal-Mart Stores, Inc.</u>, 164 F.3d 1243, 1247 (9th Cir. 1999); <u>Crowder v. Kitagawa, 81 F.3d 1480, 1486 (9th Cir. 1996)</u>, 81 F.3d at 1486; <u>see also</u> <u>Buck v. U.S. Dep't of Transp.</u>, 56 F.3d 1406, 1408 (D.C. Cir. 1995) (noting that the determination as to whether an individual can meet all the essential requirements of a program should be made in the context of an "individualized inquiry"). Summary judgment on such fact-intensive issues is simply not warranted at this early stage of litigation, where the parties have not yet completed discovery.

Defendant's request for summary judgment in its favor is similarly unwarranted.

16

Viewing the evidence presented in favor of Plaintiff, the Court cannot conclude that Plaintiff's request to forgo enforcement of Sitka's APV ordinance is indisputably unreasonable. Defendants rely on Boudreau v. Nocco, No. 8:21-cv-1158-VMC-AEP, 2022 WL 17369636 (M.D. Fla. Dec. 2, 2022), to argue that the ADA does not mandate a reworking of applicable traffic laws to accommodate Plaintiff's use of the golf cart. That case, however, is readily distinguishable. There, the court found that the plaintiffs' request to use a golf cart on the county's sidewalks in contravention of state law was not a necessary accommodation because the plaintiffs owned and lawfully used motorized scooters on the sidewalks and because there were other modes of public transportation available to them that would enable meaningful access throughout the county. Here, the record, when viewed in the light most favorable to Plaintiff, suggests that the golf cart is Plaintiff's only viable option for independent transportation given his severe mobility impairments. Sitka has not rebutted any such evidence. Moreover, whether Defendants could accommodate Plaintiff's use of the golf cart through the APV permitting process, as noted above, is not an issue susceptible to summary judgment given the undeveloped record.

Sitka further argues that unfettered access to the roadways on an electric golf cart is not, as a matter of law, a reasonable accommodation. It relies on Young v. City of Claremore, 411 F. Supp. 2d 1295 (N.D. Okla. 2005). In that case, the court granted summary judgment in favor of the city on an ADA reasonable accommodation claim. It concluded that the plaintiff did not absolutely need to use his golf cart to access the roadways but rather merely preferred it because he did not feel confident operating a

higher speed vehicle with his disability.   It also concluded that the plaintiff's request to have unlimited access to the roads and be restricted only by his own judgment as to when and where to operate his golf cart was unreasonable as a matter of law.

That is not the factual situation presented here.  Plaintiff does not seek unfettered access or to use his golf cart in any situation he deems to be reasonable.  He seeks to continue to use his golf cart as he had been, which, based on the record provided, involved driving it only on roadways with posted speed limits of 35 miles per hour or less and for minimal distances.

The fact that Plaintiff's use of his golf cart now runs afoul of Sitka's ordinances and state statutes and regulations, does not make his request unreasonable as a matter of law.  While courts generally do not second-guess public health and safety decisions, "when Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved." Crowder, 81 F.3d at 1485. The fact that Plaintiff's use of his golf cart may contradict state regulations is not determinative: "[I]t is well established that the ADA's reasonable modification requirement may preempt state law. . . . Accordingly, the possibility that a modification might preempt state law does not automatically render it unreasonable." Smith v. City of Oakland, 612 F. Supp. 3d 951, 967 (N.D. Cal. 2020).

Defendants could nonetheless prevail on the ADA claim, despite any potential showing of reasonableness, if they demonstrate that Plaintiff's use of his golf cart on the roadways would, in fact, fundamentally alter the nature of the regulatory program.  No

such showing has been made on this record to warrant summary judgment on this basis at this time.  As noted above, the record is not sufficiently developed as to which laws are essential for the safe operation of motor vehicle and for public safety.   Additionally, while a reasonable juror could conclude that safety issues are a sufficient basis to find in Defendants' favor, a reasonable juror could also conclude that allowing Plaintiff's use of his golf cart in this circumstance is not fundamentally problematic given that Sitka was willing for a period of time to treat his golf cart as a type of "electric vehicle" that did not require registration or insurance but could nonetheless travel on roads with posted speed limits of 35 miles per hour or less.[30]

State law claims

Defendants seek summary judgment on Plaintiff's claim for unlawful arrest.  To prevail on such a claim, Plaintiff must demonstrate that his freedom was restrained without proper legal authority.  Waskey v. Municipality of Anchorage, 909 P.2d 342, 345 (Alaska 1996).  Defendants assert that Plaintiff's detention was a lawful investigatory traffic stop, lasting the only the amount of time needed to consider and discuss Plaintiff's golf cart use.  The court finds that the stop was an indisputably lawful traffic stop.  The SPD officers had cause to stop Plaintiff, given there was no license plate or registration on the vehicle.[31]  The officers determined the golf cart could not be lawfully driven on

---

[30] Docket No. 11-5.

[31] Docket No. 13-4 at ¶ 8.

the roadways and then Plaintiff was free to leave. The fact that he was not allowed to drive his golf cart from the parking lot and had to arrange a different method of transportation home did not transform the stop into an unlawful arrest.

Defendants also assert that Plaintiff's Intentional Infliction of Emotional Distress ("IIED") claim should be dismissed on summary judgment. They assert that as a matter of law, there was no outrageous conduct on the part of SPD officers. Whether the conduct of the offending party is sufficiently outrageous to support an IIED claim is subject to a threshold determination by the trial court. Lybrand v. Trask, 31 P.3d 801, 803 (Alaska 2001). The court must determine whether a reasonable jury could find that the conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Odom v. Fairbanks Mem'l Hosp., 999 P.2d 123, 133 (Alaska 2000)).

There is no evidence to support a finding of extreme conduct here. The fact that the SPD decided to enforce its local traffic ordinances after the implementation of the city's APV permitting program and prohibit Plaintiff's use of the golf cart and to do so without warning, however regrettable and ill-conceived such a decision may be, is not "beyond all bounds of decency" to support an IIED claim. The requirement that owners of alternative vehicles obtain a permit was a standard embodied in the newly enacted municipal ordinance and thus SPD's decision to enforce that new standard cannot be deemed intolerable to the community which passed it. See Mitchell v. Heinrichs, 27 P.3d 309, 312 (Alaska 2001) (upholding the trial court's entry of summary judgment in favor of the defendant on an IIED claim after the evidence only showed that he had "acted in a

20

manner justified under the community standards embodied in the municipal ordinance").

CONCLUSION

Plaintiff's motion for partial summary judgment is denied at this juncture, with leave to renew after discovery has been completed. Defendants' motion for summary judgment is denied without prejudice as to Plaintiff's ADA claim but granted as to state law claims.

DATED this **29th** day of December, 2023.

/s/ H. Russel Holland
United States District Judge